738 A.2d 898

MARYLAND RACING COMMISSION, et al.

v.

CLOVERLEAF ENTERPRISES, INC.

No. 1923, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Sept. 10, 1999.

Reconsideration Denied Nov. 9, 1999.

Bruce C. Spizler, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellant, Maryland Racing Com'n.

Linda Woolf (James E. Gray, David H. Hollander, Jr. and Goodell, DeVries, Leech & Gray, LLP, on the brief), Baltimore, for Appellants, Maryland Jockey Club and Laurel Racing Assoc., Inc.

John P. McDonough (Vernell B. Arrington and O'Malley, Miles, Nylen & Gilmore, P.A., on the brief), Calverton, for Appellee.

Argued before WENNER, THIEME and SONNER, JJ.

WENNER, Judge.

Appellee, Cloverleaf Enterprises, Inc., (CEI), filed a petition with the Maryland Racing Commission (MRC) requesting permission to simulcast out-of-state thoroughbred races and conduct pari-mutuel betting at Rosecroft Raceway on these out-of-state races. CEI conducts live harness racing at Rosecroft Raceway. The Maryland Jockey Club of Baltimore City, Inc. (MJC), and the Laurel Racing Association, Inc. (Laurel), owners of Laurel and Pimlico racetracks, opposed CEI's re-

quest. After a contested hearing, the MRC denied CEI's request.

CEI then sought judicial review in the Circuit Court for Prince George's County. After considering written memoranda and oral argument, the hearing judge filed an opinion and order vacating the decision of the MRC and remanded the case to the MRC "for further proceedings consistent with this Opinion."

On appeal, Laurel and the MJC present us with the following questions: [1]

1. Should CEI's request to directly import simulcasts of out-of-state thoroughbred racing for betting at its harness track have been denied as a matter of law as unauthorized by the Maryland Horse Racing Act?

2. Assuming CEI's request was not contrary to the Maryland Horse Racing Act, did the Commission nevertheless act within the permissible range of its discretion when it denied CEI's request?

We shall answer Laurel and the MJC's first question in the negative, their second in the affirmative, and reverse the judgment of the circuit court.

### Facts

CEI is the licensed owner of Rosecroft Raceway, located in Oxon Hill, Maryland. Since 1993, with the MRC's approval, CEI has imported simulcast signals from out-of-state thoroughbred racetracks pursuant to a Facilities Use Agreement with CEI and other racetracks. After importing these signals, CEI then simulcast thoroughbred races to other Maryland racetracks and off-track betting facilities. When CEI

---

1. We have adopted the questions presented in Laurel and the MJC's brief. The MRC raises the following question in its brief:

Did the Maryland Racing Commission properly exercise its discretion in deciding that it would not be in the best interests of the Maryland horse racing industry as a whole to grant the request of a racing association, Licensed by the commission to conduct harness racing, to independently conduct betting on thoroughbred races simulcast from out-of-state?

withdrew from the Facilities Use Agreement, it filed a petition with the MRC requesting permission to simulcast out-of-state thoroughbred races, pursuant to Md.Code (1992, 1998 Repl. Vol.), § 11–804(b) of the Business Regulation Article (BR). As we said, Laurel and the MJC opposed this request on the ground that BR § 11–804(b) does not authorize cross-breed simulcasting.

The MRC referred CEI's question to the Office of the Attorney General, which concluded that § 11–804(b)'s plain language permits cross-breed simulcasting, although that may not have been the intent of the General Assembly. As the Attorney General's Office said in its opinion, under "the governing principles of statutory construction," that is, the "plain meaning rule", the "relevant statutory text ... authorizes interstate cross breed simulcasting, if the Racing Commission approves it." 82 Opinions of the Attorney General —— (1997) (No. 97–022). After a contested hearing, however, the MRC concluded that CEI's request was not in the best interest of racing, and denied the request.

CEI then sought judicial review in the Circuit Court for Prince George's County. In an Opinion and Order dated 17 September 1998, the circuit court concluded that "the reasons the Commission has advanced for denying Rosecroft its request are unsupported by competent, material and substantive evidence and therefore [the decision was] arbitrary and capricious," and remanded the case to the MRC "for further proceedings consistent with this Opinion." This appeal followed.

## I.

■ Laurel and the MJC contend that CEI's request should have been rejected as a matter of law because, although § 11–804 is not ambiguous, the statutory scheme makes clear that it was not the intent of the General Assembly to permit cross-breed simulcasting. We do not agree.

As the Court of Appeals has said, "when there is no ambiguity or obscurity in the language of the statute, there is

no need to look elsewhere to ascertain the intent of the legislative body." *Montgomery County v. Buckman*, 333 Md. 516, 523, 636 A.2d 448 (1994). Thus, "where statutory language is plain and free from ambiguity and expresses a definite and sensible meaning, courts are not at liberty to disregard the natural import of words with a view towards making the statute express an intention which is different from its plain meaning." *Fikar v. Montgomery County*, 333 Md. 430, 434–35, 635 A.2d 977 (1994) (citations omitted). Moreover, "[c]are must be taken to avoid construing a statute by forced or subtle interpretations." *Houston v. Safeway Stores, Inc.*, 109 Md.App. 177, 184, 674 A.2d 87 (1996), *rev'd on other grounds*, 346 Md. 503, 697 A.2d 851 (1997).

The Court of Appeals observed:

> If the words used are of doubtful or ambiguous meaning, their signification may be enlarged or restricted as may be necessary to make them conform to the intention of the Legislature, *if the intention is clearly and certainly ascertained by the process of construction.*

*Pressman v. Barnes*, 209 Md. 544, 558–59, 121 A.2d 816 (1956) (citations omitted) (emphasis added). With this in mind, we now turn to the matter before us.

BR § 11–804. Betting on Out–of–State races, provides:

> (b) if the Commission approves, a licensee may contract to hold pari-mutuel betting on a race that is held at an out-of-state track where betting on racing is lawful.

And, BR § 11–101(h) defines a licensee as "a person who has been awarded racing days for the current calendar year."

Laurel and the MJC maintain that the General Assembly did not intend to allow cross-breed simulcasting, pointing to the statutes keeping the two industries separate. Laurel and the MJC argue that implicit in this statutory scheme is the intent of the General Assembly to protect one industry from the other. Thus, in Laurel and the MJC's view, § 11–804(b) does not authorize cross-breed simulcasting.

We remind Laurel and the MJC, however, that:

A statute shall be construed according to the ordinary and natural import of the language used without resorting to subtle and forced interpretations for the purpose of limiting or extending its operation. That is, we must confine our-selves to the statute as written. . . . Thus, if there is no ambiguity or obscurity in the language of a statute, there is usually no need look elsewhere to ascertain the intent of the legislature.

*Wheeler v. State,* 281 Md. 593, 596, 380 A.2d 1052 (1977) (citations omitted).

In the case at hand, § 11–804(b) provides "if the Commis-sion approves, a *licensee* may contract to hold pari-mutuel betting on a race that is held at an out-of-state track. . . ." This language is clear and unambiguous. Thus, a resort to its legislative history is not necessary. Section 11–804(b) autho-rizes cross-breed simulcasting.

Nevertheless, Laurel and the MJC cite *Emmet v. Rickert,* 90 Md.App. 93, 97, 599 A.2d 1236 (1992), arguing that "when the literal words of a statute result in a construction clearly not contemplated by the General Assembly, the literal mean-ing should not be adopted." *Id.* at 97, 599 A.2d 1236 (citations omitted).

In *Emmet* we had to determine whether "The Motor Vehi-cle Administration ("MVA") is statutorily required to suspend the driver's license . . . if properly requested to do so by a judgment creditor . . . when the cause of action giving rise to the judgment involves not a motor vehicle accident but . . . improper repair of a motor vehicle." *Emmet* at 94–95, 599 A.2d 1236. In *Emmet,* however, a reference to the legislative history and statutory context of § 17–201 provided clear evi-dence of the legislature's intent, but here it does not.

Laurel and the MJC appear not to recognize that the only principle to be gleaned from the statutory scheme governing Maryland horse racing is that it was the intent of the General Assembly that some statutes apply only to the thoroughbred industry, see BR Chapter 11, subtitle 5, some only to the harness industry, see BR Chapter 11, subtitle 6, and some to

both, see BR Chapter 11, subtitle 8. Contrary to Laurel and the MJC's view, this does not indicate that it was the intent of the General Assembly not to authorize simulcasting of cross-breed races.

Moreover, Laurel and the MJC appear to overlook that the enactment of § 11–804(b) in 1992 to codify Art. 78(B), § 31, resulted in a dramatic expansion of out-of-state simulcasting. As noted both by the circuit court and the Attorney General, codification of Art. 78(B), § 31 eliminated reference to "thoroughbred" races and races of "national and local significance." Both the Attorney General and the circuit court recognized that such elimination implicitly expanded the scope of out-of-state simulcasting.

Finally, in support of their position, Laurel and the MJC cite *Farmers & Merchants National Bank v. Schlossberg*, 306 Md. 48, 56, 507 A.2d 172, 176 (1986). In *Schlossberg*, the Court of Appeals said, "[b]ecause the General Assembly is presumed to have intended that all of its enactments operate together as a consistent and harmonious body of law, statutes will be interpreted, whenever reasonably possible, to avoid repeal by implication." *Id.* at 61, 507 A.2d 172. This language is of no use to Laurel and the MJC. Were we to consider the statutory scheme as urged, we would presume that the General Assembly was aware of the statutory scheme governing Maryland racing, and consider § 11–804(b)'s context. If so, we would presume that the General Assembly was aware of the statutes separately governing Maryland racing, but here, chose not to keep the industries separate. As such, Laurel and the MJC's contention fails.

## II.

Appellants, MJC, Laurel, and the MRC ask us to consider the propriety of the circuit court having vacated the decision of the MRC and remand of the case for further proceedings.

As the Court of Appeals has said previously, "[T]he reviewing court ... must review the agency's decision in the light most favorable to the agency, since decisions of administrative

agencies are prima facie correct. . . ." *Board of Education v. Paynter,* 303 Md. 22, 35–36, 491 A.2d 1186 (1985). *See also Maryland State Police v. Lindsey,* 318 Md. 325, 333, 568 A.2d 29 (1990). "A reviewing court should not substitute its judgment for the expertise of those persons who constitute the administrative agency from which the appeal is taken." *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 513, 390 A.2d 1119 (1978).

In reviewing the decision of an administrative agency, we apply the substantial evidence test, *see* Md.Code (1984, 1995 Repl.Vol.) § 10–222(h) of the State Government Article, and ask whether the agency's decision is supported by competent, material and substantial evidence in light of the entire record as submitted. The Court of Appeals has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Supervisor of Assessments v. Group Health Ass'n, Inc.,* 308 Md. 151, 159, 517 A.2d 1076 (1986) (citations omitted).

■ Accordingly, we may not substitute our judgment for that of the agency. In other words, the substantial evidence test requires us to exercise "restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions." *State Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 309–10, 236 A.2d 282 (1967). Moreover, we have stated that it is " 'the province of the agency to resolve conflicting evidence, [and] where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inference.' " *St. Leonard Shores Joint Venture v. Supervisor of Assessments of Calvert County,* 307 Md. 441, 447, 514 A.2d 1215 (1986).

■ This standard applies to the MRC as well. As the Court of Appeals has noted, the MRC is an agency vested with virtual plenary authority to regulate Maryland horse racing. *See Lussier v. Maryland Racing Comm'n,* 343 Md. 681, 698, 684 A.2d 804 (1996). This is clear under the MRC's enabling statute, § 11–209, which provides:

General powers of Commission.

(a) Besides its other powers under this title, the Commission has the powers necessary or proper to carry out fully all the purposes of this title.

(b) The jurisdiction, supervision, powers, and duties of the Commission extend to each person who holds racing for a purse, reward, or stake.

With these principles in mind, we now turn to the case before us.

■ A careful examination of the record reveals that there was substantial credible evidence to support the decision of the MRC. The MRC reviewed Maryland horse racing's economic conditions and specifically noted that each of the industries depend on revenue received from wagers placed on races conducted at Maryland's racetracks. There was evidence that, between January 1996 and October 1997, a significant number of Maryland wagers were made on out-of-state simulcast races, and concluded that to allow CEI unfettered discretion to simulcast out-of-state thoroughbred races would significantly reduce revenues for the thoroughbred industry.

Furthermore, the General Assembly has enacted statutes that mandate take-out percentages for both industries. *See* BR §§ 11–515, 11–525, 11–615, 11–617. About 50% of the take-out received by thoroughbred racetracks must be allocated to thoroughbred tracks, and 50% to the horsemen and breeders. On the other hand, the take-out of harness racetracks is allocated entirely to harness racing. As the MRC pointed out in denying CEI's request, "to *approve* the application of the harness tracks to import out-of-state thoroughbred races and retain the proceeds therefrom (to be allocated among harness' interests), it would constitute a significant reduction in revenues to the thoroughbred industry in Maryland; and if the Commission were to *disapprove* the applications, the harness tracks would be denied such revenues."

Finally, BR § 11–519 requires the thoroughbred industry to operate and maintain the Bowie Race Course Training Center. A reduction in revenue would also reduce revenue available to

maintain the facility to the detriment of the thoroughbred industry.

In addition to considering the economic effect of cross-breed simulcasting on Maryland's thoroughbred industry, the MRC looked to the history of each industry, and concluded that ordinarily the two industries are not in competition with one another. In fact, the General Assembly has enacted statutes to reduce such competition. *See, e.g.,* BR § 11–504.[2] Furthermore, in-state cross-breed simulcasting is permitted only on approval by the sending track, its horsemen, and breeders. *See* BR § 11–811. Thus, granting CEI's request would result in unintended competition.[3]

Of course, CEI believes its request should have been granted because there was no evidence that doing so would result in economic problems for Maryland's thoroughbred racing industry. CEI also believes that "implicitly [demanding] that [CEI] waive its statutory rights or otherwise compensate Laurel/Pimlico for the right to use its own race track, as permitted by law" constitutes impermissible rule making. CEI is wrong.

As we have said previously, there was substantial evidence that CEI's request would adversely affect Maryland's thoroughbred racing industry. Further, CEI appears to believe

---

**2.** BR § 11–504 provides:

    Restrictions on racing times.
        (a) A licensee may not hold racing after 6:15 p.m. unless:
        (1) circumstances beyond the control of the licensee cause a delay;
        (2) the racing day is of national prominence; or
        (3) the racing consists of betting on races held at an out-of-state track, and the racing is:
        (i) authorized under § 11–804 of this title; and
        (ii) approved by the harness track licensee whose track is closest to the licensee's track, the group that represents a majority of the owners and trainers who race horses at that harness track, and the group that represents a majority of the harness breeders in this State. . . .

**3.** Although we rejected Laurel and the MJC's notion that the statutory scheme requires the industries to be considered separately, this does not preclude the MRC, which has expertise in this field, from considering the impact on competition.

its request was the only issue to be addressed by the MRC. According to CEI, because there was no evidence in support of Laurel and the MJC's position, it was entitled to have its request granted. As we have said, the MRC is vested with virtual plenary authority by BR § 11–209 to regulate horse racing in Maryland. Hence, CEI was not entitled to have its request granted, because the MRC was vested with broad authority either to grant or to deny CEI's request, consistent with what was considered by the MRC to be in the best interests of the Maryland racing industry. In sum, as the MRC's decision was neither arbitrary nor capricious, we shall reverse the judgment of the circuit court.

**JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.**